1          HONORABLE RICHARD A. JONES

2

3

4

5

6

7

8                UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
9                        AT SEATTLE

10   THOMAS BOUCHER, et al.,

11              Plaintiffs,
                                         CASE NO. C10-199RAJ
12         v.
                                         ORDER
13   FIRST AMERICAN TITLE INSURANCE
     COMPANY,

14              Defendant.

15
                         I.  INTRODUCTION
16
            This matter comes before the court on the motion (Dkt. # 83) of Plaintiffs Thomas
17
     and Carol Boucher to certify a class comprised of Washington homeowners who
18
     purchased title insurance from Defendant First American Title Insurance Company
19
     ("First American") during certain refinancing transactions.  The parties requested oral
20
     argument, but the court finds oral argument unnecessary in light of its disposition today.
21
     For the reasons stated herein, the court DENIES Plaintiffs' motion without prejudice to
22
     their election to renew their motion prior to August 5, 2011.
23
                         II.  BACKGROUND
24
            The court begins with the deceptively simple foundation of this case:  all title
25
     insurance companies in Washington are required to file their policy prices with the state's
26
     Insurance Commissioner, and they may not charge premiums that exceed those prices.
27

28   ORDER – 1

RCW § 48.29.140(2).[1]  Until late 2007, First American had 17 rate manuals covering different sets of Washington counties.  It now has 5 rate manuals.  None of the rate manuals are complex.  They set "general schedule" rates that increase incrementally with the policy amount, which is typically the amount that the customer borrows in the mortgage transaction.  A "mortgage reorganization" rate of 50% of the general schedule rate applies, generally speaking, when a lender's title insurance policy is already in place for the property and a new deed of trust on the same property is executed by the same buyer.  For now, the court relies on simpler terms: people who refinance their mortgages in Washington are typically entitled to a 50% discount on their title insurance, so long as they obtained a qualifying title insurance policy for their lender in connection with their prior mortgage.

Plaintiffs contend that First American overcharges people who are entitled to the 50% discount.  To begin with, they contend that First American overcharged them for title insurance when they refinanced their Skagit County home in September 2005.  They believe they were entitled to a 50% discount on a filed rate of $735, or a premium of $367.50.  Instead, they paid $821.

Plaintiffs did not purchase their title insurance directly from First American. Instead, they relied on an out-of-state settlement agent, who billed them for a First American policy that Alliance Title Company ("Alliance") issued.  Stucyzynski Decl. ¶¶ 37-45.  The settlement agent had no affiliation with First American.  Alliance was a First American agent at the time, but there is a dispute about whether Alliance was authorized to issue policies in Washington.  There is also a dispute about whether First American was ever paid for the policy Alliance issued, or whether Alliance simply pocketed the premium.  Moreover, it appears that Alliance charged the settlement agent

---

[1] Recent changes to the law have led to the Insurance Commissioner issuing new rules governing the filing and approval of title insurance rates.  *See* RCW § 48.29.140(4) (requiring Commissioner to adopt rules for filing in compliance with new statutory framework at RCW § 48.29.143 and § 48.29.147); WAC § 284-29A-030 (setting transition timetable that eliminates RCW § 48.29.140 rates by January 1, 2012).

ORDER – 2

$455 for the policy it issued.  *Id.*, Exs. D&E.  The settlement agent nonetheless charged Plaintiffs $821.

Most of First American's title insurance sales in Washington are less controversial.  In the 13 counties where First American maintains its own "title plant," it sells title insurance directly to customers.  About 25 authorized agencies sell First American insurance in other Washington counties.  Those agencies are independent entities, but they require First American's authorization to sell its policies.  First American does not monitor every policy that its agents sell to determine if the customer was properly charged, but it periodically audits rate compliance.  There is no question that First American has the power to require its independent agents to comply with its pricing policies.

Plaintiffs hope not only to redress their own overcharge, but Ms. Boucher hopes to represent a class of all Washingtonians who were entitled to the 50% discount from First American but did not receive it.[2]  She is not alone in seeking to represent a statewide class of First American refinance customers.  At least five federal courts in other states have certified classes of First American customers who claim to have been overcharged when they bought title insurance while refinancing.  Indeed, Plaintiffs themselves have attempted to participate in at least two such lawsuits.  Mr. Boucher first appeared as a putative class representative in June 2008 in the Eastern District of Michigan, joining a Michigan plaintiff in an effort to certify a class of First American customers in several states, including Washington.  While a motion to transfer the Michigan suit to this court was pending, Plaintiffs moved in December 2009 to intervene as class representatives in *Lewis v. First American*, a similar action pending in the District of Idaho on behalf of First American customers in 5 states, including Washington.  The next month, the Michigan court transferred its case to this court.  The Idaho court ultimately certified only

---

[2] Mr. Boucher had a stroke in 2009 and has been unable to participate in this litigation since.  For that reason, only Ms. Boucher seeks appointment as a class representative.

ORDER – 3

1    a class of Idaho residents in *Lewis*, and denied Plaintiffs' motion to intervene in

2    September 2010.

3           The record reveals very little about how many Washingtonians First American

4    deprived of the 50% refinance discount.  First American has identified about 170,000

5    customers who obtained title insurance from it in refinance transactions.  The court has

6    no idea over what time period those transactions occurred, because no party addresses

7    that question.  First American provided the 170,000 figure in response to an interrogatory

8    that it answered in November 2009 about transactions going back to the beginning of

9    1997.  Terrell Decl. (Dkt. # 82), Ex. H (response to Pltfs.' Interrog. No. 6).  First

10   American's response incorporated general objections that any transactions prior to May

11   2003 were beyond the statute of limitations, but it is not clear whether the number it

12   provided reflects that limitation.  *Id.*  The evidence reflects, therefore, that over

13   somewhere between 6 and 12 years, 170,000 Washingtonians bought title insurance from

14   First American in refinance transactions.  First American suggests that the 170,000 figure

15   is unreliable, because its records do not reliably segregate between refinance customers

16   and initial purchase customers.

17          Not all refinance transactions, however, qualify for the 50% discount.  First

18   American's rate manuals require that a refinanced property be subject to a prior lender's

19   title insurance policy to qualify for the discount.  Some of the rate manuals require the

20   same borrower for both the prior transaction and the refinance transaction.  First

21   American contends that many refinance transactions do not qualify for the 50% discount.

22   Many lenders, even large institutional lenders, do not obtain title insurance, or purchase

23   limited policies.  This is especially true when the prior loan is not a first-position

24   mortgage, but rather a home equity loan or similar subordinate obligation.  Sellers who

25   personally finance mortgages often eschew title insurance.  Also, customers who paid off

26   their prior mortgage are not eligible for the refinancing discount.

27

28   ORDER – 4

In repeating First American's list of circumstances that disqualify refinancing customers from the 50% discount, the court must emphasize that there is no evidence before it that reveals how often these circumstances occur.  Neither First American nor Plaintiffs have provided such evidence.  On the record before the court, there is no way to estimate the fraction of First American refinancing customers who do not qualify for the 50% discount.

There is also no way, on the record before the court, to estimate the number of First American customers who qualified for the 50% discount but did not receive it. Plaintiffs themselves are in this category, as are as many as 3 other First American customers:  Steven Bell, Clint and Claudia Hooper, and Rodney and Diana Kirkpatrick.[3] Plaintiffs apparently learned of these 3 customers during their pre-litigation investigation, although there is no evidence before the court as to the scope or methodology of that investigation.  Plaintiffs have been seeking to represent a class of Washingtonians since at least June 2008 (when they first appeared in this lawsuit while it was pending in Michigan), and it appears that their counsel has been seeking to represent a Washington class for several years before that.  Plaintiffs have had ample opportunity to use discovery and other means to assess how many customers First American overcharged.  So far as the record reveals, their sole effort to do so was to request a sample of records of First American customers who obtained only a lender policy.[4]  They requested 400 records; they received 200.  Preston Decl. (Dkt. # 94), Ex. B at 26 (Req. for Production No. 31). There is no evidence as to how First American selected those 200 records.

Of the 200 records Plaintiffs received, they contend that 7 of them are evidence of customers who were entitled to the 50% discount but did not receive it.  It appears that

---

[3] Where spouses or others bought property and title insurance together, the court refers to them as a single First American customer.

[4] When a person buys a home initially, she must typically purchase a title insurance policy for herself as well as one for her mortgage lender.  In refinance transactions, no owner's policy is necessary.

ORDER – 5

1    the sole records First American produced for these 200 customers were its HUD-1

2    settlement statements.  Those statements reflect both the amount of the loan and the

3    amount the borrower paid for the lender's title policy.  Plaintiffs compared those amounts

4    to First American's rate manuals and identified 7 customers who allegedly overpaid.

5    T.W., S.&D.T., M.J.M., L.L., R.&R.W., J.G., and P.E.[5]  Schwartzman Decl. ¶¶ 11-19 &

6    Ex. C.[6]

7             First American argues that it did not overcharge 5 of the 7 customers Plaintiffs

8    identified.  For those 5 customers, First American argues (via the declaration of its

9    underwriting counsel) that "other documents" in its possession reveal either that the

10   customer did not qualify for the 50% discount, or that the HUD-1 information about the

11   amount of the loan is inaccurate, and that the policy was properly priced based on the

12   correct loan amount.  Stuczynski Decl. (Dkt. # 95) ¶¶ 22-27.  First American has not filed

13   the "other documents" with the court.  First American's counsel's description of these

14   "other documents" would hardly seem to be the best evidence of their contents, but

15   Plaintiffs have offered no objection.  Indeed, Plaintiff offers neither evidence nor

16   argument to counter First American's contention that it properly charged these 5

17   customers.

18            First American implicitly admits that its records do not rule out the possibility that

19   2 of the 7 customers Plaintiffs identified were entitled to the 50% discount but did not

20   receive it.  Stuczynski Decl. (Dkt. # 95), ¶ 28.  It contends however, that it cannot

21   "conclusively determine" whether the customers qualified for the discount because First

22

23   [5] First American has insisted that its business records containing information identifying its
     customers are confidential.  Several motions to seal are pending addressing this issue and others.

24   The court uses customer initials where there is a dispute about whether their names should be
     kept confidential.  The court will address the motions to seal in a separate order.

25   [6] First American moved to strike Plaintiffs' evidence of the review of the 200 records because it

26   came in the form of a declaration from Plaintiffs' counsel, who used his declaration to
     summarize his review of the HUD-1 statements First American provided.  At this stage in the

27   litigation, there is no need to strike counsel's declaration, which does little more than summarize
     the contents of the HUD-1 statements and First American's rate manuals.

28   ORDER – 6

American's files do not contain a copy of a prior lender's title policy. *Id.* First American admits, again implicitly, that the lack of evidence of a prior policy in its records does not determine whether the customers in question actually had such policies.

Thus, after four years of litigation, the evidence of the number of First American customers who were entitled to the 50% discount but did not receive it is as follows:

- As many as 170,000 Washington customers might have qualified for the discount, but that number is unreliable for a number of reasons.

- For various reasons, some of those 170,000 customers did not qualify for the 50% discount, but there is no competent evidence of how many customers did not qualify, and no basis to even make a reasonable estimate.

- Plaintiffs' pre-litigation investigation identified 3 other customers who First American arguably overcharged. Through discovery, they identified 2 customers out of a sample of 200 who might have been overcharged. There is no evidence as to how First American compiled that sample.

On this record, Plaintiffs ask the court to certify a class of all Washingtonians whom First American wrongfully denied the 50% discount.

## III.   ANALYSIS

**A.   Class Certification Standards**

The court's decision to certify a class is discretionary. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). Fed. R. Civ. P. 23 ("Rule 23") guides the court's exercise of discretion. A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the [three alternative] requirements of Rule 23(b)." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007). Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representative will adequately represent the class. *Gen. Tel. Co. of the S.W. v. Falcon*,

ORDER – 7

457 U.S. 147, 161 (1982); Fed. R. Civ. P. 23(a).  If a plaintiff satisfies the Rule 23(a) requirements, she must also show that the proposed class action meets one of the three requirements of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

In considering Rule 23's requirements, the court must engage in a "rigorous analysis," but a "rigorous analysis does not always result in a lengthy explanation or in-depth review of the record."  *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (citing *Falcon*, 457 U.S. 147, 161 (1982)).  The court is neither permitted nor required to conduct a "preliminary inquiry into the merits" of the plaintiff's claims.  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)); *see also* Fed. R. Civ. P. 23 advisory committee's note (2003) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision").  As long as the court has "sufficient material before [it] to determine the nature of the allegations, and rule on compliance with [the] requirements [of Rule 23], and [it] bases [its] ruling on that material, [its] approach cannot be faulted because plaintiffs' proof may fail at trial."  *Blackie*, 524 F.2d at 901.  The court may assume the truth of a plaintiff's substantive allegations, *id*. at 901 n.17, but may require more than bare allegations to determine whether a plaintiff has satisfied the requirements of Rule 23.  *See*, *e.g.*, *Clark v. Watchie*, 513 F.2d 994, 1000 (9th Cir. 1975) ("If the trial judge has made findings as to the provisions of the Rule and their application to the case, his determination of class status should be considered within his discretion.").

The court now applies these standards to Plaintiffs' allegations and evidence.

**B.     Plaintiffs Have Not Shown that Their Proposed Class Satisfies All Four Prerequisites of Rule 23(a).**

Plaintiffs initially defined the class they seek to represent as follows:

All persons who, while residing in the State of Washington, and in connection with a mortgage financing transaction where the loan amount did not exceed $1,000,000: (a) paid a premium for the purchase of

ORDER – 8

residential title insurance from First American Title Insurance Company;
(b) had an unsatisfied mortgage from an institutional lender; and (c) did not
receive the fully and correctly discounted price specified in the applicable
First American Title Insurance Company Manual.

Pltfs.' Mot. at 3.

There are at least two problems with this definition.  First, it contains no temporal limitation.  Second, the definition conditions a customer's class membership on a finding that First American is liable to him or her.  Only those customers who did not receive the "fully and correctly discounted price" are members of the class.  So, for example, if the court certified the class and later determined on summary judgment that First American correctly discounted all class members' premiums, then the class would have no members.  A "fail-safe class" like this ensures that a defendant cannot prevail against the class, because if the defendant prevails, the class will not exist.  *See*, *e.g.*, *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008).

In reply, Plaintiffs concede both points.  They agree to include only First American customers who purchased insurance on or after November 28, 2003.  First American had no opportunity to respond to this proposal, but the court will adopt it for purposes of this order.[7]  They also agree to revise their class definition so that it does not depend on First American's liability, but rather on objective data about First American's customers.  The court thus considers the certification of the following class:

All persons who, while residing in the State of Washington, and in
connection with a mortgage financing transaction where the loan amount
did not exceed $1,000,000: (a) paid a premium on or after November 28,
2003 for the purchase of residential title insurance from First American
Title Insurance Company; (b) had a lender's title insurance policy that
insured the lien of a deed of trust on the same property that had been issued
at the scheduled rate; and (c) did not receive the reorganization rate
specified in the applicable First American Title Insurance Company
Manual.

Pltfs.' Reply at 14.

---

[7] Plaintiffs chose the November 28, 2003 date because it is three years prior to the filing date of the *Lewis* lawsuit in Idaho.  Plaintiffs contend that the filing of *Lewis* tolled the statute of limitations for all putative class members, including Washingtonians.

ORDER – 9

### 1.     Numerosity

A class satisfies Rule 23's numerosity requirement when it has so many members that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

Putting aside Plaintiffs themselves, there is no evidence in the record of another person who meets Plaintiffs' class definition. Plaintiffs offer no evidence that Mr. Bell, the Kirkpatricks, or the Hoopers had a prior lender title insurance policy. Instead, they provide evidence that each of them had a prior mortgage from an institutional lender. Schwartzman Decl. ¶¶ 7-10. First American neither admits nor denies that these three customers had prior lender policies. Stuczynski Decl. ¶¶ 29-32. It insists, however, that a prior institutional mortgage is not a proxy for a prior lender title policy. *Id.* ¶ 32. As to the 7 customers Plaintiffs selected from First American's 200-record sample, there is also no evidence of any prior lender title insurance policy. As noted, Plaintiffs offer nothing to counter First American's evidence that 5 of the 7 customers were not entitled to the 50% discount. As to the remaining 2 customers, no one has produced evidence that they did or did not have prior lender policies.

On this evidence, the court is in no position to make even a rough estimate of how many people fall within Plaintiffs' class definition. As many as 170,000 Washingtonians during an unknown time period qualified for discounted rates. How many of them did First American charge more than the discounted refinance rate? No one knows. Plaintiffs invite the court to invent numbers out of thin air. They begin with the unreliable 170,000-customer figure and state that "[e]ven assuming an extremely conservative overcharge rate of 20 percent, the result is 34,0[00] transactions where [First American] overcharged Washington homeowners for title insurance." Pltfs.' Mot. at 8. Plaintiffs offer no basis whatsoever to assume an overcharge rate of 20%, much less a basis to characterize that rate as "extremely conservative." Plaintiffs' analysis of the 200-customer sample that First American produced during discovery suggests that *at most* 2 of those 200 customers, 1% of them, overpaid. Plaintiffs argue that even if only 1% of

ORDER – 10

the 170,000 customers overpaid, the class has 1700 members.  But for at least two reasons, the court cannot assume that 1% of First American's discount-qualified customers overpaid.  First, the only way to arrive at the 1% figure is to assume (without any evidence) that the 2 customers in the 200-customer sample had prior lender title policies.  Second, without knowing more about how First American selected the 200-customer sample, there is no reason to assume that the sample is representative of its other 170,000 potentially qualifying customers.

In similar cases against First American in other states, courts have taken various approaches to the numerosity inquiry.  In several of the cases, the plaintiffs provided much better evidence as to the number of class members.  For example, in *Slapikas v. First American*, 250 F.R.D. 232, 237 (W.D. Pa. 2008), the plaintiffs subpoenaed one of First American's agents and reviewed nearly 900 files, finding evidence that the customer was overcharged in as many as 67% of those cases.  First American disputed that finding, but nonetheless estimated an overcharge rate of 4.4%.  *Id.* at 239 n.5.  Even First American's dramatically lower estimate implied a class with 20,000 members.  In *Campbell v. First American*, 269 F.R.D. 68, 74 & n.4 (D. Me. 2010), plaintiffs identified 167 potentially overcharged customers, and First American did not contest numerosity.  In this case, Plaintiffs have identified 5 customers who *might* have overpaid, 3 of whom were known to them before they filed suit.

In other cases, the court made a numerosity finding without particularized discussion of the evidence plaintiffs offered.  In *Lewis v. First American*, 265 F.R.D. 536, 554 (D. Idaho 2009), the court discussed Plaintiffs' "evidence, based on a review of several HUD-1 statements, that there are likely thousands of potential class members . . . ."  The court did not describe this evidence.  Similarly, in *Hamilton v. First American*, 266 F.R.D. 153, 158-59 (N.D. Tex. 2010), the court described plaintiffs' estimate of more than 50,000 class members, without describing what evidence plaintiffs offered to support that estimate.

ORDER – 11

The court declines at this time to make a finding that the class Plaintiffs seek to represent is or is not sufficiently numerous. The court acknowledges that if First American overcharged even a small fraction of its refinance customers, the total number of customers overcharged would likely satisfy Rule 23's numerosity requirement. For example, assuming that the number of Washington customers who qualified for the 50% discount was roughly 170,000, an overcharge rate of even a tenth of a percent (0.1%) would indicate a class of 170 members. The court's concern with this numerosity-by-assumption approach is that it makes any corporation with a large number of customers vulnerable to a class action without proof of class-wide wrongdoing. Imagine, for example, a Starbucks customer who received an underfilled cup of coffee. By Plaintiffs' logic, that customer could sue on behalf of a class of similarly aggrieved customers by the simple expedient of declaring "if Starbucks underfilled the cups of even a tiny fraction of its millions of customers, then the class is sufficiently numerous." The court declines to sanction that approach.

### 2.    Commonality

Plaintiffs easily satisfy Rule 23(a)(2)'s commonality requirement. Plaintiffs must only show that "there are questions of law or fact common to the class." Although Rule 23(a)(2) speaks of "questions" in the plural, a single common issue is sufficient to meet the commonality requirement. *E.g.*, *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies."). There are several common legal questions: Does Washington law impose strict liability on title insurers who charge their customers in excess of filed rates? Are there any defenses available to an insurer who overcharges? Common factual issues include the filed rates in each Washington county and the differing prerequisites for those rates, and well as First American's policies for determining if a customer qualifies for the 50% discount.

ORDER – 12

The court reserves a discussion of the issues that are not common to all class members for its discussion of Rule 23(b)(3), which requires Plaintiffs among other things to show that common questions predominate over individualized questions. *See Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).").

### 3.    Adequacy and Typicality

Unlike the numerosity and commonality criteria, the criteria of adequacy of representation and typicality focus on the class representatives. *See Hassine v. Jeffes*, 846 F.2d 169, 176 (3d Cir. 1988) ("'[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff[s]"). Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." This standard is permissive: claims or defenses are typical "if they are reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." In determining whether the Plaintiffs are adequate class representatives, the court must consider if they have "any conflicts of interest with other class members" and whether they will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020.

First American contends that the unusual circumstances surrounding Plaintiffs' refinancing means that they are unlike other class members. Plaintiffs did not purchase title insurance directly from First American or from an authorized Washington agent. Instead, they relied on two out-of-state entities, a settlement agent and Alliance. Alliance had authority to issue First American policies, but not in Washington. Alliance charged the settlement agent $455, but First American contends it received no portion of that premium. First American had no agency relationship with the settlement agent, and it

ORDER – 13

appears that the settlement agent alone was responsible for charging Plaintiffs $821 for a $455 policy.

Even accepting First American's version of the facts, Ms. Boucher is a typical class member in that she allegedly overpaid, and not necessary atypical merely because she is subject to agency-law defenses.  Importantly, even if First American bears no responsibility for the settlement agent's conduct in charging Plaintiffs $821 for a $445 policy, Alliance still charged $445 for a policy that Plaintiffs argue should have cost only $367.50.  First American must therefore contend with an overcharge of $77.50 by one of its agents, a claim that is identical in all but amount to the claims of other class members.  It is possible that First American will eventually prove that Alliance's actions were those of a rogue agent, and that it bears no responsibility for those actions under principles of agency law.  But that is not a foregone conclusion.  Moreover, given that First American sells a significant portion of its Washington policies through independent agents, many class members may be subject to agency-law defenses.

Because the court will not certify a class today, it will not reach a final conclusion on whether Ms. Boucher's claims are typical of other class members' claims.  If Plaintiffs continue their effort to certify a class, they may wish to consider one or more additional class members.

The court concludes, however, that Ms. Boucher is an adequate class representative.  First American makes much of Ms. Boucher's uncertainty about the details of her 2005 refinance and her admissions that her husband handled many aspects of that transaction.  Those differences are immaterial in a case like this one, where the facts essential to establishing liability are likely to come from documentary evidence in the hands of First American or third parties.  Proof of Ms. Boucher's claims will require reference to First American's rate manuals, information in First American's records, and, if necessary, information from Ms. Boucher's prior lender about the policy it obtained.  Little is required of Ms. Boucher.  First American also fails to persuade the court by

ORDER – 14

pointing out Ms. Boucher's unfamiliarity with the legal intricacies of this case.  Those details are for her counsel to master, not her.  The record before the court establishes that Ms. Boucher's counsel is experienced in class litigation and capable of representing the class.  On this record, the court finds that Ms. Boucher and her counsel could adequately represent the class.

**C.     On the Record Before the Court, Plaintiffs Have Not Satisfied Rule 23(b)(3).**

Plaintiffs rely solely on Rule 23(b)(3) to certify the proposed class.  To certify a Rule 23(b)(3) class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The "predominance" and "superiority" prongs of Rule 23 work together to ensure that certifying a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal citation and quotation omitted).  A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole*, at 944 (quoting *Zinser*, 253 F.3d at 1189).  Rule 23(b)(3) provides a non-exclusive set of factors to guide the court's predominance and superiority inquiries:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

The court must determine whether resolution of common questions would resolve a "significant aspect" of the class members' claims such that there is "clear justification" for class treatment.  *Hanlon*, 150 F.3d at 1022 (citations omitted).

ORDER – 15

1    The primary obstacle to both a finding of superiority and a finding of
2    predominance in this case is that Plaintiffs have yet to demonstrate that they can
3    efficiently discover the evidence necessary to prove their claims.  Somehow, Plaintiffs
4    must be able to sift through evidence pertaining to as many as 170,000 First American
5    refinance customers and develop the evidence necessary to show that they belong to the
6    class.  In their only attempt so far, Plaintiffs largely failed.  Plaintiffs have at least a rough
7    means of determining who *does not* belong in the class, because HUD-1 settlement
8    statements coupled with First American's rate manuals seem to quickly reveal who
9    received the 50% discount.  If the 200-customer sample that First American produced is
10   any indication, the vast majority of its refinance customers received the discount.  But,
11   where a HUD-1 reveals a customer who appears to have overpaid for title insurance,
12   Plaintiffs have not been able to determine whether that customer was actually
13   overcharged.  To do so, they need evidence beyond the HUD-1 statement.  So far as the
14   record reveals, Plaintiffs have not even attempted to obtain that evidence.

15   Plaintiffs' ability to efficiently assemble the evidence necessary to prove that a
16   customer was entitled to the 50% discount (or not) is critical to both the superiority and
17   predominance inquiry.  If Plaintiffs cannot efficiently assemble the evidence, then
18   individualized issues about each customer's transaction will dominate this litigation, and
19   common issues will not predominate.  In the same vein, if Plaintiffs cannot find a way to
20   determine who is qualified for the discount on a classwide basis, the court cannot
21   conclude that a class action is superior to individual litigation.  Among other things, if
22   Plaintiffs cannot identify who belongs to the class, they will have difficulty notifying
23   class members of this action and their right to opt out of it.  *See* Fed. R. Civ. P.
24   23(c)(2)(B) (requiring notice to members of a 23(b)(3) class).

25   On the record before the court, Plaintiffs have not shown that they can assemble
26   the evidence necessary to prove (or disprove) class member's claims.  Accordingly, the

28   ORDER – 16

1    court concludes that they have not satisfied either the predominance or superiority

2    requirements of Rule 23(b)(3).

3                                    **IV.  CONCLUSION**

4            For the reasons stated above, the court DENIES Plaintiffs' motion to certify a

5    class.

6            The court denies the motion without prejudice to a renewed motion for class

7    certification.  If Plaintiffs renew the motion, they must (at a minimum) demonstrate to the

8    court that they have developed a means of identifying who belongs to the class, and they

9    must show that they have used that methodology to actually identify at least some class

10   members.  Plaintiffs may pursue additional discovery in this vein.

11           The court sets a deadline of August 5, 2011 for Plaintiffs to either renew their

12   motion for class certification or formally abandon their class claims.  If Plaintiffs seek an

13   extension of this deadline, they must demonstrate with specific evidence that they are

14   diligently pursuing the evidence necessary to support a renewed class certification

15   motion.  If Plaintiffs renew their class certification motion, neither party need repeat the

16   arguments they advanced in the instant motion.  The court expects the parties to focus on

17   the concerns it articulated in this order.

18           DATED this 2nd day of May, 2011.

19

20

21                                              _____

22                                              The Honorable Richard A. Jones
                                                United States District Judge
23

24

25

26

27

28   ORDER – 17